**In re Petition of S.M. & R.S., In re KA.D., In re J.D., H.O., Appellant.**

**Nos. 08–FS–1093, 08–FS–1130 to 08–FS–1133 and 08–FS–1151.**

District of Columbia Court of Appeals.

Argued Sept. 29, 2009.
Decided Dec. 10, 2009.

---

James Klein, Public Defender Service, with whom Samia Fam and O. Dean Sanderford, Public Defender Service, were on the brief, for appellant.

Marion E. Baurley, for appellees Ka.D. and J.D.

Stacy L. Anderson, Assistant Attorney General, Office of the Solicitor General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Jenny E. Epstein, Washington, DC, for appellees S.M. & R.S.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Before us is an appeal from two adoption decrees that terminated the rights of a father with respect to his twin boys. Because, as the District itself now acknowledges, the adoption proceedings did not sufficiently take into account the preference applicable to a fit father, we vacate the adoption decrees and remand the case for further proceedings consistent with this opinion.

## I.  Factual Background[1]

This case first came to court on a neglect complaint filed by the District of Columbia on December 22, 2003, against K.D. (mother)[2] and H.O. (father, appellant) with respect to their two biological

---

1. The proceedings in this case cover a long period of time and are extremely extensive. Since this case is going to be subject to a further hearing and considering that the file is sealed, we have limited the factual presentation to only those elements vital to an understanding of this opinion. We express the court's appreciation to counsel for all parties for the excellent briefs and argument in this case.

2. K.D., the boys' mother, is not a party to this case, having consented to the boys' adoption on August 1, 2007.

children, Ka.D. and J.D., twin boys born in April of 2001. The complaint asserted both unsanitary conditions in the home and an allegation of sexual abuse by K.D.'s biological daughter, T.D., age 12, against H.O.[3] At the time, K.D. and H.O. were living with the boys and with S.D., age 7, another daughter of K.D.'s, in H.O.'s apartment. S.D. and T.D. are not related to H.O., and T.D. was not living with H.O., K.D., and the other children at the time of the alleged abuse.

On January 12, 2004, K.D. stipulated that the boys were neglected. Because K.D. had been admitted to the Family Treatment Court Program (FTCP) for drug abuse, the boys were placed there in order to remain with their mother, a decision to which H.O. understandably did not object. No ruling with respect to neglect chargeable to H.O. was ever made. The treatment provided to K.D. at the FTCP was unsuccessful, and later in 2004 she violated the terms of the FTCP. In November, the court revoked K.D.'s protective supervision and placed the boys into the custody of the Child Family Services Agency. At that time, custody with H.O. was not an option for the boys because H.O. was temporarily in prison following his arrest for sexual abuse. Upon removal from their mother at the end of September, the boys were placed with a foster parent, Ms. Wright, with whom they would reside for the next two years.

At a January 6, 2005, hearing, the court changed the boys' permanency goal from reunification with K.D. to reunification with H.O., saying it would wait to make further changes to the permanency goal pending the outcome of H.O.'s criminal case. In August, 2005, H.O. was convicted of two counts of misdemeanor sexual abuse and one count of simple assault, stemming from the charges leveled against him by T.D. At a September 13, 2005, permanency hearing, the permanency goal was changed to adoption. H.O. objected, through counsel, requesting custody for himself. The sexual abuse conviction was a key reason the court listed for changing the permanency goal from reunification with H.O.

Matters then proceeded along the adoption route. On November 1, 2005, the District filed petitions to terminate H.O.'s and K.D.'s parental rights, pursuant to D.C.Code § 16–2351 *et. seq.* The case was transferred to the present trial judge, who held a further permanency hearing on February 7, 2006. By that time, S.M. and R.S., the petitioners in the adoption case, had begun meeting with the boys pending receipt of a necessary license, but the boys remained in foster care. At this hearing, H.O. requested the permanency goal be changed back to reunification with him, a request the court denied. The District's termination motion was held in abeyance. As had been the case since the commencement of the proceedings in December of 2003 and was to continue until the adoption decree, H.O. faithfully and regularly visited with the boys during this period.

The boys moved into S.M. and R.S.'s home on December 22, 2006. The adoption petition[4] was formally filed on March

---

**3.** At the initial hearing on probable cause, the magistrate judge relied on a third factor: lack of parental control. This stemmed from the drug activity of K.D. and her mother, I.D., and from H.O.'s decision to leave the children with K.D. and I.D., despite knowing them to be drug abusers. No evidence of drug use by H.O. himself was ever presented. At the time of the initial hearing, H.O. had already been employed by the same company for over 25 years.

**4.** While technically, separate petitions were filed for the boys and separate adoption decrees entered, for convenience we refer to them in the singular.

22, 2007. H.O. was served with notice of the adoption petition on April 20, 2007. He was instructed to show cause why his consent to the adoption was being withheld "contrary to the best interest of the child pursuant to D.C.Code § 16–304(e)."

Hearings on the petition commenced on May 15, 2007, and continued over a number of separate days to the end of September. The court heard the testimony of H.O., various social workers, witnesses to the interactions of the boys with S.M. and R.S., and witnesses to the interactions of the boys with H.O. On November 9, 2007, the court issued its order waiving parental consent on the ground that the father was withholding consent against the best interests of the boys. On June 26, 2008, the court issued findings of fact and conclusions of law. A final decree of adoption was issued on July 15, 2008. H.O. timely appealed. H.O.'s brief asserts that he last saw the boys on August 16, 2008, little more than a year ago.

Subsequent to the entry of the adoption decree, this court heard oral arguments on H.O.'s appeal from his convictions, found nonharmless error in limitation on cross-examination of the complainant T.D., and reversed the convictions and remanded for a new trial. *[O] v. United States,* 964 A.2d 147 (D.C.2009). The District states that the charges against H.O. remain pending.

## II. Analysis

In deciding this case, we apply principles of constitutional and statutory law that have been well established in this jurisdiction. The parental rights of the appellant, H.O., were terminated as a result of the adoption. District of Columbia law provides two methods by which this may lawfully be accomplished. One method is through a termination proceeding brought by the District or the child's legal representative under D.C.Code § 16–2353

(2001). *See, e.g., In re A.B.,* 955 A.2d 161 (D.C.2008). The other is through an adoption proceeding commenced by a private party, as part of which a court may grant the adoption over the objection of a natural parent "when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interests of the child" under D.C.Code § 16–304(e) (2001). *See, e.g., In re D.H.,* 917 A.2d 112 (D.C.2007). As this court has noted, the second method is the functional equivalent of the first. *In re P.S.,* 797 A.2d 1219, 1222 (D.C.2001). This is of necessity; in either situation, the consequence for the parent is the same: termination of his or her parental rights. *In re L.W.,* 613 A.2d 350, 356 (D.C.1992). *See M.L.B. v. S.L.J.,* 519 U.S. 102, 116 n. 8, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (noting that in either case, the parent "resists the imposition of an official decree extinguishing, as no power other than the State can, [his] parent-child relationships"). H.O.'s parental rights were terminated via the second method.

■ Under either method, the paramount consideration is the best interest of the child. *In re L.W., supra,* 613 A.2d at 356. Under either method, the court making the decision on what is in the child's best interest must be guided by the factors set forth in § 16–2353(b). *In re H.B.,* 855 A.2d 1091, 1098 (D.C.2004). Those factors are:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration be-

ing the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;

. . .

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided. . . .

D.C.Code § 16–2353(b) (2001).[5]

These factors are applied, however, against a broader background. We have followed the Supreme Court in recognizing the gravity of a decision whether to terminate parental rights. "Repeatedly, we have stated that biological parents have a 'fundamental liberty interest . . . in the care, custody, and management of their child. . . .'" *In re J.T.B.*, 968 A.2d 106, 116 (D.C.2009) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (internal citation and quotation marks omitted)). *See also, e.g., Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (recognizing long line of precedent protecting fundamental right to parent).

■ In this jurisdiction, we have held "that the [termination] statute incorporates into the best interest standard a preference for a fit unwed father who has grasped his opportunity interest and that

this preference can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons." *Appeal of H.R.*, 581 A.2d 1141, 1143 (D.C. 1990).[6] Otherwise put, application of the statute must take into account the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit. *See In re J.G.*, 831 A.2d 992, 1000–01 (D.C.2003); *In re S.G.*, 581 A.2d 771, 781 (D.C.1990). It follows that the question of a natural parent's fitness must be a relevant consideration. The presumptive right of a fit parent over an adoptive parent is not absolute. The presumption must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent. *Appeal of H.R.*, 581 A.2d at 1144. Thus, in *In re Baby Boy C.*, 630 A.2d 670 (D.C. 1993), we affirmed the adoption decree where, despite the preference for the fit father, the trial court found by clear and convincing evidence that the child would suffer significant psychological harm from being removed from the home in which the child had lived for nine years.

■ In *Appeal of H.R.*, we reversed and remanded the trial court's granting of an adoption petition because the court merely conducted a traditional "best interest" balancing test without including a custodial preference for a fit parent.[7] 581

---

**5.** Subsection 3A of § 16–2353(b) regards so-called "boarder babies," left at the hospital by their parents. Because this subsection is not relevant to the present case, we omit it here.

**6.** The District of Columbia does not require, as some jurisdictions do, a "discrete and preemptory unfitness finding [before the court can move to a best interest analysis]." *In re K.A.*, 484 A.2d 992, 998 (D.C.1984).

**7.** We have held that noncustodial fathers are entitled to the presumption in favor of a fit parent only after they have "grasped" their "opportunity interest," *i.e.,* after they have "early on, and continually, done all that [they] could reasonably have been expected to do under the circumstances to pursue [their] interest in the child." *In re T.W.M.*, 964 A.2d 595, 601 n. 6 (D.C.2009) (quoting *Appeal of*

A.2d at 1152–53. We conclude we must do so again here. We review a trial court's order granting adoption for abuse of discretion, determining whether the trial court "exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors." *In re T.W.M.*, *supra* note 7, 964 A.2d at 601 (quoting *In re Baby Boy C.*, 630 A.2d at 673 (internal citations and quotation marks omitted)). In its brief, acknowledging that the case must be remanded, the District states: "It is clear from [the trial court's] repeated statements and rulings that H.O.'s parental fitness was irrelevant to the proceedings that he did not afford H.O. the parental preference required under relevant statutes as construed by this Court." On the record here, we are constrained to agree.

By way of example, in a pretrial hearing on May 7, 2007, in which the court denied H.O. more detailed discovery responses from the petitioners, the court stated to H.O.'s counsel:

I understand, but you're asking them to assess the suitability of your client as a parent. They don't have any obligation to do that. That's your obligation.... [I]t's up to you to defend your client's interest and to negate what they say as well as to build your own case to say that your client is a fit and proper parent. They—but—merely because they're saying that they are better and it's in the best interest of the children for them doesn't mean that they have obligation [sic] to sit there and to prove that your client is an inappropriate choice. They don't have to prove that.

The court reinforced this understanding of the case when it made comments to counsel for K.D., describing the reasons why it allowed the petitioners to introduce evidence of the children's bonding with them while at the same time not permitting inquiries by the natural parents into the fitness of the petitioners.[8] The court explained that fitness should not be the focus of the proceedings:

[T]hat's why there was an objection to counsel for the father saying, tell me how my client is unfit, when that's not the standard for the TPR.... And so the Government's burden in this is not to prove the unfitness of the parents. And indeed the case law suggests that that is not the case. And that's not the requisite or the *sine qua non* for termination of parental rights. It is, rather, the child's need for continuity of care and caretakers.

It is noteworthy that H.O. had not been explicitly adjudicated unfit or even neglectful at any point prior to the show cause hearing.[9] Nor did the court after the

---

*H.R.*, 581 A.2d at 1163). Appellees do not claim that H.O., who had been involved with the boys since birth, failed to grasp his opportunity interest.

8. The court's limiting instructions as to the proper scope of inquiry by H.O., as well as the court's reluctance to provide H.O. with facts and assertions upon which the petitioners' claim rested, further suggest that the court failed to recognize sufficiently that it was dealing with a parent to whom the presumption applied.

9. The misdemeanor conviction overshadowed the entire course of proceedings. Even considering the case in the light in which the trial court viewed it, before the conviction was overturned, we cannot say that the conviction necessarily implies a finding of unfitness. The District points out that if it attempted to establish neglect on the part of H.O. based on abuse of another child, the District would have to show the abused child lived in the same household or was "under the care of the same parent, guardian or custodian" as J.D. and Ka.D. D.C.Code § 16–2301(9)(A)(v). T.D. was not a biological child of H.O.'s and was not living in the same household as the boys at any relevant time. Even if she were, the District acknowledges that "a finding of im-

hearing find that H.O. was unfit so as to negate by itself the presumption. While the trial court did find that H.O. was withholding consent contrary to the best interests of the children, it made no express finding that clear and convincing evidence showed that it was in the best interests of the children to be placed with the adoptive parents as opposed to the presumptive preference for H.O.[10]

Some cause for the court's erroneous focus may lie in the procedures that are apparently used to commence a waiver proceeding under § 16–304(e) as opposed to one seeking termination of parental rights under § 16–2353. In the latter case, the statute provides that the motion for termination must contain extensive information underlying the motion, including, *inter alia*, "a plain and concise statement of the facts and opinions on which the termination of the parent and child relationship is sought." D.C.Code § 16–2354(d)(4) (2001). In waiver proceedings, it appears that pursuant to Super. Ct. Adoption R. 4, a show cause order is used, as here, which informs the parents that a hearing is being held on an adoption petition regarding their children, and that in order to prevent termination of their parental rights, they must arrive at the specified time and place and "SHOW CAUSE WHY YOUR CONSENT TO THE ADOPTION SHOULD NOT BE WAIVED AND DISPENSED WITH on the legal grounds ... that you are withholding your consent contrary to the best interest of the child pursuant to D.C.Code § 16–304(e)" (capitalization in original). This procedure may suggest that the burden is placed on the parent in such a proceeding. This is not the case, and it cannot be the case where the government seeks to strip a parent of rights that "are of such grave importance that they are classified as fundamental." *In re J.L.*, 884 A.2d 1072, 1076 n. 3 (D.C. 2005) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).[11]

█ To be sure, at the end of the day, the paramount consideration must of course be the best interest of the child. *In re L.W.*, 613 A.2d at 356. The rights of even fit parents "are not absolute, and must give way before the child's best interests." *In re Baby Boy C.*, 630 A.2d at 682

minent danger 'because another child in the same household has been abused cannot be automatic.'" (Brief of District, quoting from *In re Kya. B.*, 857 A.2d 465, 472 (D.C.2004) (internal citations and quotation marks omitted)). Rather, we have held that an individualized finding must be made for each child. *In re Kya. B.*, 857 A.2d at 473.

10. The court did express the view that removal of the boys from the custody of S.M. and R.S., with whom they had lived for barely six months at the commencement of the hearing, would be "very harmful" to the boys. However, this conclusion came largely from the testimony of an art and play therapist who had never seen H.O. interact with the boys, or met with H.O. in any capacity. H.O. was hardly a stranger to these boys: unlike so many cases that come before us, the father had been involved in the boys' lives since birth and shown a faithful commitment to visitation during the pendency of these proceedings. The District in its brief expresses the view that the therapist's testimony cannot constitute the requisite clear and convincing evidence. In any event, in the circumstances of this case, with the long-standing relationship between H.O. and his boys and the relatively short time of residence with petitioners, it would appear that the typical consideration of "bonding" may not apply with its usual force.

11. It is not immediately clear why, as H.O. argues, the same sort of notice is not given in waiver cases as in termination, when the ultimate effect on the natural parent is the same. It is true that, in H.O.'s case, the statutory termination notice had been given to him, albeit a year and a half previously in November 2005, in connection with the District's motion to terminate parental rights.

(quoting *In re A.B.E.*, 564 A.2d 751, 755 (D.C.1989)); *see also, e.g., In re J.G*, 831 A.2d at 1001 ("parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child"). But here, the trial court approached the issue without according H.O. the presumption and preference to which our case law entitles him. "[W]e cannot properly assume that the court's application of [its findings], while looking through the prism of an erroneous legal test, would be the same when looking through another prism intended to grant presumptive custody to a fit natural father as against strangers." *Appeal of H.R.*, 581 A.2d at 1182 (Ferren, J., concurring). In the circumstances here, we must agree with the District that neither the adoption decree nor the termination of parental rights can stand.

The issue remains as to the appropriate remedy to apply. H.O. asks us to vacate the adoption decree and instruct the trial court to dismiss the adoption petition and to take immediate steps for an orderly transfer of custody to H.O. H.O. bases this argument on the dual premises that (1) the evidence at the show cause hearing was insufficient as a matter of law, and (2) that being the case, a remand forcing H.O. into further proceedings to defend his parental rights would be inappropriate. Given the nature of this proceeding, we agree with the District's contrary argument that the proper course of action is to remand the case to the trial court for further proceedings without addressing the evidentiary issue.

Contested adoption proceedings are unlike civil cases, which typically involve only facts gone by, or criminal cases, where the subject of possible deprivation is a defendant's personal freedom. This is not merely a dispute between the petitioning parties on the one hand and H.O. on the other. The ultimate parties in interest are the boys themselves. And for them, their lives are an ongoing event. Thus, in adoption cases, "the judge's independent duty as *parens patriae* to act in the child's best interest cannot be effectively carried out if artificial restrictions are placed on the scope of his or her inquiry." *In re L.W.*, 613 A.2d at 352–53 n. 6.[12] The boys as well as H.O. are entitled to a fresh assessment of the present situation in which the presumption and preference in favor of H.O. is fully taken into account.

The final decree of adoption is vacated and the case remanded for further proceedings consistent with this opinion. Because H.O.'s parental rights are intact and he is entitled to the presumption accorded fit parents, the trial court should fashion appropriate visitation for H.O. with the boys pending further determinations on remand.

*So ordered.*

---

**12.** H.O. argues that our decision in *In re T.J.*, 675 A.2d 30 (D.C.1996), compels a different result. In that case, however, the facts were clear and our legal decision dictated the result. That is not so here. With a remand, we have not found it necessary on this appeal to deal with a myriad of other issues raised by H.O. These include complaints about the adequacy of notice, as discussed above, limitations on cross-examination, refusal to permit an expert witness to testify, the application of a strict scrutiny test to adoption proceedings, allegedly erroneous factual findings, and exclusion of H.O. from the second phase of the adoption proceeding. We do observe that his claim that petitioners "lack standing" to bring this action lacks merit, where the boys had been residing in their home for a number of months. *See Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 842 n. 45, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).